# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
April 17, 2012 Session

## HARRIET TUBMAN DEVELOPMENT/CHA v. REGINALD LOCKLIN

**Appeal from the Circuit Court for Hamilton County**
**No. 11C211     W. Neil Thomas, III, Judge**

---

**No. E2011-01068-COA-R3-CV-FILED-MAY 31, 2012**

---

The Chattanooga Housing Authority ("CHA") evicted its tenant, Reginald Locklin ("the Tenant"), after two of his sons were involved in an incident with neighbors. The eviction was accomplished by order of the trial court giving CHA possession of the property. The Tenant appeals arguing that CHA, which is a public housing authority ("PHA"), made the decision to evict him and his family arbitrarily and without due process. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed; Case Remanded**

CHARLES D. SUSANO, JR., delivered the opinion of the Court, in which HERSCHEL P. FRANKS, P.J., and D. MICHAEL SWINEY, J., joined.

Emily O'Donnell, Chattanooga, Tennessee, and Cecil VanDevender, Nashville, Tennessee, for the appellant, Reginald Locklin.

Larry L. Cash and Jade D. Dodds, Chattanooga, Tennessee, for the appellee, Harriet Tubman Development/Chattanooga Housing Authority.

## OPINION

### I.

In 2005, the Tenant became a resident of unit 314 of CHA's Harriet Tubman Development in Chattanooga. The occupants were the Tenant and his five children. They lived next door to the "Rice family." The two families shared a yard and there was some friction between the Tenant's children and members of the Rice family.

On the evening of November 13, 2010, the Tenant went holiday shopping and left his

children at home. At some point during the evening, an argument broke out between members of the Tenant's family and members of the Rice family and their guests. At 11:05 p.m., CHA police officer James Avery was called to the scene. He spoke to several people there, including the Tenant's son, 15-year-old Demarcus Locklin, and Shantasia Mills, the 16-year-old daughter of Ms. Rice. With one variation, they both gave the same account of what happened. There is no dispute that Demarcus Locklin kicked in the front door of the Rice residence and went inside to confront Shantasia. Once inside, he called Shantasia a "bitch" and told her he was going to hit her, but did not. The door had to be replaced. Demarcus Locklin told officer Avery that some male in the gathering had spit on him and he became angry.

Officer Avery arrested Demarcus Locklin for vandalism and burglary. He also arrested Demarcus' older brother, Reginald Ballard, for disorderly conduct. Both were in officer Avery's patrol car when the Tenant returned home. The Tenant asked officer Avery to come inside and discuss what happened, but officer Avery declined. The officer stated that he was going to recommend eviction. Demarcus Locklin pleaded guilty to a delinquency charge of vandalism in juvenile court.

On November 14, 2010, officer Avery, with the concurrence of the "chief of public safety," provided a " 'one strike' notification" recommending that the Tenant be evicted in three days based on a determination that he "poses an immediate threat to the Health, Safety, and Welfare of the community." The notification contains a recitation of the officer's findings and states that "[b]ased on our investigation, the included information contains facts concerning the above resident that constitute a violation under the federal 'One Strike' guidelines for public housing." By letter dated November 22, 2010, the "site manager" of CHA's Harriet Tubman Development notified the Tenant that "[i]n accordance with Section Q(7-C) of the Chattanooga Housing Authority's Lease, you are hereby notified that your lease will terminate three (3) days from the date of this letter." The reason given was "violent or criminal activity that threatens the health, safety, or right to a peaceful enjoyment of any development by residents or any person on CHA developments." The Tenant was informed that there would not be a grievance hearing and that he could contest CHA's decision in the unlawful detainer action that was to be filed against him.

CHA filed an unlawful detainer action in general sessions court. The Tenant failed to appear and the sessions court granted CHA a judgment by default. The Tenant appealed to the trial court. At the bench trial there, CHA called two witnesses. The Tenant also testified. CHA introduced a copy of its lease with the Tenant as an exhibit as well at the letter of termination and the "one strike" notification. CHA's first witness was the site manager, Yashika Ward. She authenticated the exhibits and testified that in the past CHA had experienced problems and complaints against the Tenant for failure to supervise his

children.  On cross-examination, Ms. Ward admitted that the Tenant had made at least one verbal complaint that other children in the development were bothering his children. She told him that he should file a written complaint but he declined to do so.

CHA's second and last witness was officer Avery.  He testified to the events prompting the arrest of Demarcus and the sending of the "one strike" notice.  In addition to what we have already set out, he testified that Demarcus could not point out the male that spit on him.

The Tenant testified his problems began when the Rice family moved in next door. His family had reportedly experienced conflict with the Rice children even before they moved into CHA's Harriet Tubman Development.  The problems, like bullying of his children and disrespect for the Tenant, only escalated when they became neighbors.  The Tenant testified that he simply instructed his children to stay away from the Rice children.

After hearing the proof and argument, the court announced its decision from the bench:

> All right.  This case would appear to hinge on the issue of spitting, which is the only justification I've heard for the conduct which took place.  If there was no spitting or if there was no spitting at [the] time and place near the incident, then Demarcus Locklin committed, and I quote, criminal activity that threatened the health, safety or right to peaceful enjoyment of Shantasia Mills.  He broke in the door, he came after her, and said I'll hit you.
>
> Clearly no one has said, and there is no evidence that Shantasia Mills did the spitting.  So I don't know what justification the spitting would have for an attack on Shantasia Mills, nor is there any evidence of time and space regarding the spit.  In other words, did it happen next door?  Did it happen in the yard? When did it happen? Consequently I'm going to grant judgment for the Authority.

The court entered an order that CHA "be restored to possession of the premises."  The Tenant filed a timely notice of appeal.

II.

The Tenant raises the following issues:

> Was [CHA's] decision to evict [the Tenant] and his family arbitrary and capricious, where the housing authority failed to engage in a process of reasoned decisionmaking [sic] based on an investigation of the facts and a balancing of relevant policy considerations?
>
> Was [CHA's] decision to evict [the Tenant] and his family arbitrary and capricious, in light of the relevant facts, circumstances, and policies?

CHA asks us to consider the fact that the Tenant moved out while this appeal has been pending; it contends the appeal is moot.

III.

We will review this case pursuant to the following standard of review:

> We ordinarily review findings of fact of a trial court de novo upon the record with a presumption of correctness, unless the preponderance of the evidence is otherwise. *See* Tenn. R. App. P. 13(d). When the trial court has not made a specific finding of fact on a particular matter, however, we review the facts in the record under a purely de novo review. *Fields v. State*, 40 S.W.3d 450, 457 n. 5 (Tenn. 2001). We review all issues of law de novo upon the record with no presumption of correctness. *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993).

*In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "Determining whether a case is moot is a question of law." *Alliance for Native American Indian Rights in Tennessee, Inc. v. Nicely*, 182 S.W.3d 333, 338-39 (Tenn. Ct. App. 2005).

IV.

We will first consider whether this case is rendered moot by the Tenant's surrendering of possession of the premises to CHA pursuant to the trial court's judgment. CHA has asked

-4-

us to consider this post-judgment fact pursuant to Tenn. R. App. P. 14(a). Under Rule 14(a) we may consider post-judgment facts, "capable of ready demonstration, affecting . . . the subject matter of the action such as mootness." The Tenant concedes that he has surrendered possession of the property to CHA. Accordingly, we grant CHA's motion and treat it as a given that the Tenant has moved from the premises.

We must therefore consider whether the Tenant's surrender of the property renders this case moot. "A case must remain justiciable through the entire course of litigation, including any appeal. A case is not justiciable if it does not involve a genuine, continuing controversy requiring the adjudication of presently existing rights. " *Alliance for Indian Rights*, 182 S.W.3d at 338 (citations omitted). There are several recognized exceptions to the mootness doctrine as stated in *Norma Faye Pyles Lynch Family Purpose LLC v. Putnam County*, 301 S.W.3d 196, 204 (Tenn. 2009) (footnotes omitted):

> Over time, the courts have recognized several circumstances that provide a basis for not invoking the mootness doctrine. These circumstances include: (1) when the issue is of great public importance or affects the administration of justice, (2) when the challenged conduct is capable of repetition and of such short duration that it will evade judicial review, (3) when the primary subject of the dispute has become moot but collateral consequences to one of the parties remain, and (4) when the defendant voluntarily stops engaging in the challenged conduct.

The Tenant argues that this case fits within the "collateral consequences" exception because there are such consequences to having been evicted from public housing. Among these consequences are the ineligibility to be on any CHA waiting list for 12 months after eviction and five years after eviction for "serious criminal activity." *See* Chattanooga Housing Authority, Admissions and Continued Occupancy Policy 4.6.8. We agree with the Tenant that there are collateral consequences to his eviction that justify a decision on the merits in this appeal. We decline to hold this case is moot.

The parties are in agreement that a PHA, because it is an arm of the government, cannot make the decision to evict arbitrarily or capriciously. *See Nashville Housing Auth. v. Taylor*, 442 S.W.2d 668, 672 (Tenn. Ct. App. 1968). The Tenant argues that a PHA "(1) must engage in a process of reasoned decision making that considers all relevant facts and circumstances and balances applicable policy considerations, and (2) reach a decision that is substantively reasonable." The Tenant also argues that at the "contested eviction hearing, the PHA must . . . be able to articulate how and why it made the decision to evict" and the

trial court must determine that "neither [the decisionmaking[1] process nor the substantive decision] was arbitrary or capricious." (Brackets in original.) CHA argues that "strict liability" termination is allowed for criminal activity that adversely affects other tenants. CHA also argues that it did consider the relevant facts and circumstances and did make a substantively reasonable decision in this case.

It will be helpful to have additional background concerning PHAs, such as CHA. CHA and other local PHAs operate under the umbrella of the United States Housing Act of 1937, as amended in 1988. *Memphis Housing Auth. v. Thompson*, 38 S.W.3d 504, 505 (Tenn. 2001)(citing 42 U.S.C. 1437 *et seq.*); *Giggers v. Memphis Housing Auth.*, No. W2010-00806-SC-R11-CV, 2012 WL 1075163 at * 4 (Tenn. April 2, 2012). The purpose of the Housing Act is to "promote safe public housing for PHA tenants." *Giggers*, at *3. Accordingly,

> [a] federal statute requires that public housing authorities, such as MHA, use leases that
>
>> provide that any *criminal activity* that threatens the health, safety, or right to peaceful enjoyment of the premises by other tenants *or* any *drug-related criminal activity* on or off such premises, engaged in by a public housing tenant, any member of the tenant's household, or any guest or other person under the tenant's control shall be cause for termination of tenancy.
>
> 42 U.S.C. § 1437d( l)(6) (Supp.2000).

*Memphis Housing*, 38 S.W.3d at 505-06 (emphasis added). In the *Memphis Housing* case, the Court observed that in attempting to comply with the Housing Act, the lease obligated the tenant in that case to

> refrain from and cause household members, guests, or persons under the resident's control from engaging in *any criminal activity or unlawful activity that threatens the health, safety or right to a peaceful enjoyment of the Memphis Housing Authority's public housing premises by other residents* or employees of the Memphis Housing Authority *which includes*

---

[1]In the quoted material, "decision making" is incorrectly shown as one word.

*but is not limited to any drug-related criminal activity* on or off
the premises.

*Id*. at 506 (emphasis added).  Similarly, the lease in the present case states that the Tenant

shall be obligated:

\* \* \*

Not to engage in any violent or criminal activity that threatens
the health, safety, or right to peaceful enjoyment of any
development by residents or any person on CHA developments.

Not to engage in any gang, drug - or alcohol-related activity that
threatens the health, safety, or right to peaceful enjoyment of
any development by residents . . . .

(Paragraph numbering omitted.)  The similarity between the lease in the present case and the
lease in *Memphis Housing* is important.  In *Memphis Housing*, the Court held the

threshold inquiry to be whether or not the language of the lease
provides a clear answer to the question presented.  In Tennessee,
when construing a lease courts cannot make a new contract for
the parties.

*Id*. at 511.  The Supreme Court further held that

both the language of this lease, and the federal statute from
which it is derived, clearly impose strict liability upon the
resident or household members for engaging in drug-related
criminal activity.

*Id*. at 512.  In other words, the High Court held that a PHA may evict a tenant for drug-
related criminal activity without further inquiry into additional circumstances.

The Tenant concedes that criminal activity makes him "eligible" for eviction but
asserts that eligibility has no bearing on the pertinent inquiry of whether CHA used the
appropriate procedure to evict him.  We must disagree based on the holding of *Memphis
Housing*.  The pertinent question we believe is whether the holding of *Memphis Housing*
is to be limited to the context of drug-related criminal activity.  We hold that *Memphis*

-7-

***Housing*** applies equally to criminal activity that threatens the health, safety, or right to peaceful enjoyment of other residents. There are several reasons for our holding. First, it serves the legislative purpose, as stated in ***Giggers,*** of promoting "safe public housing for PHA tenants." 2012 WL 1075163 at *3. Second, it is consistent with the statutory requirement that all leases have language informing tenants that their lease can be summarily terminated in two circumstances: (1) "criminal activity that threatens the health, safety, or right to peaceful enjoyment . . . by other tenants" and (2) "any drug-related criminal activity." Third, it is consistent with the language of the lease at issue in ***Memphis Housing*** and the lease in the present case.

We are aware that a violation that makes a tenant eligible for eviction does not necessarily require eviction of that tenant. *See* ***Dep't of Housing and Urban Dev. v. Rucker***, 535 U.S. 125, 133 (2002). This does not, however, help the Tenant as much as he would like; all it means is that a PHA has the discretion to take a hard line of "strict liability" or may, in the proper exercise of its discretion, allow an offending tenant to stay. *Id*. at 134. The applicable federal regulations provide that in making its decision, the

> PHA may consider all circumstances relevant to a particular case such as the seriousness of the offending action, the extent of participation by the leaseholder in the offending action, the effects that the eviction would have on family members not involved in the offending activity and the extent to which the leaseholder has shown personal responsibility and has taken all reasonable steps to prevent or mitigate the offending action.

24 C.F.R. § 966.4(l)(5)(vii)(B) (2010).

The Tennessee Supreme Court, in ***Giggers***, recently considered whether a PHA could be held liable for the negligent failure to evict a tenant that was eligible for eviction because of a previous violent criminal act. 2012 WL 1075163. ***Giggers*** was a wrongful death action brought by the survivors of a tenant that was killed by a tenant who allegedly should have been evicted. *Id*. at *1. The Supreme Court rejected the PHA's claim of immunity for what the PHA argued was a discretionary function. *Id*. at *6. The Court determined that the decision to evict is "operational in nature" because it involves the implementation of existing policies and standards rather than debate and formulation of new policy. *Id*. Both parties argue that ***Giggers*** supports their position.[2] We remain persuaded that ***Memphis Housing*** answers the question before us. ***Giggers*** does not change the result.

_____

[2]Because ***Giggers*** was decided after the parties filed their briefs and just days before the oral argument, we allowed the parties to submit supplemental briefs on the effect of the ***Giggers*** opinion on this case.

Alternatively, even if we agreed with the Tenant about the tests to be employed, which we do not, we disagree with his conclusions. We note that even if he is correct that it would have been reasonable to allow him to stay, that does not prove that it was unreasonable to require him to leave. This, we believe, is the element of operational choice that the Court referenced in *Giggers*. The trial exhibits show that CHA determined that the Tenant's son, Demarcus, a member of the household, who was specifically listed on the lease, posed a serious threat to the safety of the Rice family and their enjoyment of their residence. The Rice's front door was so seriously damaged that officer Avery testified he could see through it. Once inside the residence, the Tenant's son called Shantasia Mills a derogatory name and threatened to hit her. There was also evidence that CHA considered the Tenant to be lax in supervising his children. The court found that the attack on Shantasia Mills was unprovoked in that even if some male in the group spit on Demarcus Locklin, there was nothing to tie the "spitting" in time, place or identity of interest to Shantasia Mills. In short, the evidence in the record preponderates in favor of finding that CHA considered appropriate factors in its decision to evict the Tenant and reached a decision that was reasonable under the circumstances.

V.

The judgment of the trial court is affirmed. Costs on appeal are taxed to the appellant, Reginald Locklin. This case is remanded, pursuant to applicable law, for enforcement of the trial court's judgment and for collection of costs assessed by the trial court.

_____
CHARLES D. SUSANO, JR., JUDGE